## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN MICHIGAN

DEBORAH NICKE,

    Plaintiff,

                          Case No.

v.

                          Hon.

CIOX HEALTH, LLC

    Defendant.

---

Batey Law Firm, PLLC
SCOTT P. BATEY (P54711)
RYAN FOWLER
Attorney for Plaintiff
30200 Telegraph Road, Suite 400
Bingham Farms, Michigan 48025
(248) 540-6800-telephone
(248) 540-6814-fax
sbatey@bateylaw.com
rflower@bateylaw.com

---

## **PLAINTIFF'S COMPLAINT AND JURY DEMAND**

NOW COMES, Plaintiff, Deborah Nicke (hereinafter "Nicke"), by and through her attorney's Scott P. Batey and the Batey Law Firm, PLLC, and for her Complaint against Defendant states as follows:

1.    Plaintiff is a resident of the City of Chesterfield, County of Macomb and State of Michigan.

2. Defendant, CIOX Health, L.L.C. (hereinafter "CIOX") is a foreign limited liability company duly authorized to conduct business throughout the southeastern district of Michigan, whose resident agent is CSC-Lawyer Incorporating Service, and whose registered office address is 601 Abbott Rd., East Lansing, MI 48312.

3. The events producing the original injury occurred in Macomb County, Michigan.

4. Jurisdiction and venue are proper in the District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) & (c).

5. Plaintiff brings this action for damages stemming from the acts and/or omissions of Defendant constituting harassment, discrimination, adverse employment action and wrongful termination which resulted in emotional and economic damages to the Plaintiff in violation of the Americans with Disabilities Act ("ADA"), Michigan Persons with Disabilities Civil Rights Act.

6. The amount in controversy exceeds $75,000.00 and is otherwise within the Jurisdiction of this Court.

## GENERAL ALLEGATIONS

7. Plaintiff incorporates by reference paragraphs 1 through 6 of the Complaint as though fully set forth herein.

8. Plaintiff was hired by CIOX Health on or about June 13, 2016 and was most recently employed as a Client Services Representative.

9. Plaintiff was diagnosed with degenerative joint disease in 2016 which is a disability which substantially interferes with major life activities including driving, sitting, standing and walking.

10. On February 5, 2018 Plaintiff was told by Eric Dombrowski and her supervisor, Laura Pellerito during a conference call with HR that she was being terminated as part of a downsizing.

11. Sometime between May 1, 2018 and May 11, 2018 Mr. Dombrowski called Plaintiff, told her she was a good employee and hard worker and asked if she wanted her job back.

12. Plaintiff immediately agreed and they discussed they would continue her regular three-day work week, Monday through Wednesday. They did not discuss her hours and Plaintiff assumed her work schedule would remain the same between 6:30 a.m. and 3:00 p.m.

13. On or about May 21, 2018 Plaintiff returned to work and learned that her daily scheduled had changed to 8:00 a.m. to 4:30 p.m. placing her commute directly during rush hour and increasing her daily commute by more than 30 minutes each way.

14. After driving this schedule Plaintiff realized that being in traffic that long was seriously impacting her health and her pain because her disability would not allow her to remain seated for that long.

15. On June 26, 2018 Plaintiff sent a letter to Mr. Dombrowski, including a carbon copy to Colleen from HR, requesting that her schedule be adjusted back to 6:30 a.m. to 3:00 p.m. the same schedule she had before the re-hire.

16. In response to Plaintiff's request, Mr. Dombrowski and Ms. Pellerito appeared to be visibly angry and denied the accommodation.

17. Ms. Pellerito in particular was outraged Plaintiff made the request and told her "other employees travel from long distances, why are you complaining?"

18. Plaintiff explained to Ms. Pellerito that she was disabled and the old schedule helped with her disability because she was not trapped in a car for so long.

19. Ms. Pellerito angrily told her "your schedule will remain 8:00 to 4:30 and that's, that."

20. On or about June 28, 2018 Plaintiff filed a request to be accommodated due to her disability of a headset to answer the phone and to change her shift back to prior shift of 6:30 a.m. to 3:00 p.m. would allow her to avoid rush hour traffic and shorten the length of her commute.

21. Plaintiff specifically requested that he shift be switched from 8:00 a.m. to 4:30 p.m. back to 6:30 a.m. to 3:00 p.m. which would reduce her commute time by at least 30 minutes and provide great relief from her physical pain caused by her disability.

22. Both of these accommodations were reasonable as they were available to other employees and they would help the symptoms of her disability.

23. Plaintiff's requests were again denied by her immediate supervisor, Ms. Pellerito.

24. After requesting the accommodation Ms. Nicke began to experience harassment from her supervisors who became verbally abusive, nit-picking her performance and hovering over Plaintiff as she tried to work.

25. On July 24, 2018 Ms. Pellerito called Plaintiff into her office and scolded her for an email she sent the day earlier explaining that some co-workers were not processing files correctly which was hurting productivity in the company.

26. Ms. Pellerito scolded Plaintiff about her email and continued to harass, berate and humiliate Ms. Nicke for more than an hour.

27. She told Plaintiff that she was no longer allowed to email her with any concerns or problems, but instead she had to call Ms. Pellerito on her own personal phone.

28. On August 1, 2018 HR approved Plaintiff's requests for the accommodations over Ms. Pellerito's and Mr. Dombrowski's rejections.

29. Between August 14 and August 20, 2018 Plaintiff began correcting some of the files that her co-workers did not process properly and named the file "Do Not Scan, please enter your own work to scan."

30. Mr. Dombrowski immediately jumped on Plaintiff's email as an excuse to berate and harass her once more sending her an email accusing her of an "extremely poor display of team work, and a disregard to direction."

31. Plaintiff was later called to Mr. Dombrowski's office where she was ambushed by Mr. Dombrowski and Ms. Pellerito.

32. Plaintiff told Mr. Dombrowski and Ms. Pellerito that his comments about her "poor display of teamwork" was offensive, and Dombrowski accused her of violating a "protocol" that had either never been in place or never told to Plaintiff.

33. Mr. Dombrowski and Ms. Pellerito made a huge production out of it to humiliate Ms. Nicke to her co-workers, who expressed sympathy to Plaintiff and told he they could not believe how she was being treated.

34. Dombrowski then went further and prohibited Plaintiff from emailing any of her co-workers demanding that she call them instead.

35. Plaintiff was the only person on the team prohibited from emailing.

6

36. Dombrowski then provided Plaintiff with a phone and an email stating:

> Deborah-the phone was purchased with the intent to better our communication as a team. Please use the phone moving forward…once you call with a question/concern, one of us will send you a follow-up email recording.

37. On October 2, 2018 Plaintiff received another email from Dombrowski instructing her that Plaintiff only use the phone they gave her to communicate with anyone from CIOX.

38. Prior to requesting the accommodations due to her disability Plaintiff was treated as part of team, equally with her co-workers, but after requesting the accommodations she was ridiculed and discriminated against.

39. Due to the stress and demoralizing harassment Plaintiff was subjected to, she became very depressed, not sleeping, extremely anxious and crying all the time.

40. On October 2, 2018 Ms. Pellerito came to the office early when Plaintiff was the only one there.

41. Ms. Pellerito called Plaintiff into her office and began harassing her about her use of the telephone.

42. Plaintiff asked her why they, including Ms. Pellerito, Mr. Dombrowski, Ms. Speicher, and Kathryn Weddle were placing unreasonable expectations on her which were not expected of anyone else.

43. Ms. Nicke complained they were treating her differently by having different standards for her, prohibiting her from using email and only allowed her to use the phone they provided which interfered with her ability to do her job.

44. Ms. Pellerito became enraged at Plaintiff's complaints of a hostile work environment and started yelling.

45. Initially, Plaintiff respectfully listened to Ms. Pellerito's abuse, but when it became too much, she excused herself said she needed to get back to work and walked back to her workstation. Ms. Pellerito followed Plaintiff to her workstation and stood over her, intimidating her and continuing to abuse Plaintiff.

46. Plaintiff again asked her why she was being treated so differently from everyone else, and Ms. Pellerito demanded Plaintiff log-off and leave the building.

47. Plaintiff started the process of closing down all of her applications, but her computer was not fast enough for Ms. Pellerito who began yelling that she was calling security to have Plaintiff escorted from the building.

48. Instead, Ms. Pellerito called Mr. Dombrowski and put Plaintiff on the phone with him.

49. Dombrowski started by asking Plaintiff what happened?

50. When Plaintiff tried to explain, he started interrupting her.

51. After Dombrowski interrupted Plaintiff, she started asking him the same question: "Why are they treating me so different from the way they treat everyone else?"

52. Plaintiff asked him that same question several times, but like Ms. Pellerito he refused to answer.

53. When Plaintiff asked "Why are they treating me so different from the way they treat everyone else," both Dombrowski and Pellerito refused to answer, but neither of them denied they were treating her differently.

54. Instead of answering Plaintiff's question, Dombrowski just told her to log off, go home and wait for him to call with further instructions.

55. The next day Plaintiff began contacting Michelle Speicher from Human Resources to complain about the hostile work environment she was experiencing due to her disability and request to be accommodated.

56. Initially, it appeared that Ms. Speicher may provide Plaintiff with some relief from the harassment and discrimination when she asked Plaintiff if she was willing to work at a different hospital location where she was not under the management of either Dombrowski or Pellerito.

57. Plaintiff said that she certainly would and that she was grateful for being offered that option because she could not handle much more abuse.

58. Plaintiff told Speicher she wanted to discuss the incident in detail face-to-face with her.

59. Speicher advised Plaintiff that she would come to Michigan (from New York where she worked) within the next few weeks to meet with Plaintiff so she could discuss Plaintiff's concerns.

60. When Plaintiff finally met with Speicher, the meeting which included another manager was focused only on Plaintiffs productivity, which was very strange because Plaintiff was meeting her quota, and the meeting was scheduled to address Plaintiff's complaints.

61. Speicher and the other manager started asking Plaintiff about different figure demands which were not Plaintiff's quota and when Plaintiff tried to bring up the events of October 3rd, Ms. Speicer said that they were not going to discuss that with her.

62. Instead of taking remedial measures in response to Plaintiff's complaints, Speicher began harassing Plaintiff too by ordering her to include all communications between Plaintiff and her immediate supervisor, Pellerito to go through Michelle.

63. It was apparent that Defendant was attempting to create and build an excuse to terminate Plaintiff. Pellerito even demanded that Plaintiff start sending Speicher a copy of her daily Productivity Report and any other communication.

10

64. Plaintiff was treated differently than similarly situated employees who did not request to be accommodated for a disability and no other CSR employee was required to communicate to their supervisors through HR.

65. On December 12, 2018 Plaintiff was terminated due to her disability and requests for reasonable accommodations in violation of the American with Disabilities Act.

66. Plaintiff filed a charge with the EEOC and received a Right to Sue letter on September 17, 2019.

## COUNT I
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990

67. Plaintiff incorporates by reference paragraphs 1 through 66 of the Complaint as though fully set forth herein.

68. Plaintiff suffers from s degenerative joint disease which substantially interferes with major life activities and is a disability under The Americans with Disabilities Act of 1990 ("ADA").

69. Defendant perceived and regarded Plaintiff as being a person with a disability.

70. Pursuant to the ADA, Plaintiff is guaranteed the right to be free from discriminatory treatment and/or discharge from her employment by her employer and/or supervisors based upon her disability.

71. Plaintiff's disability was a factor in Defendant's employment decisions, including, termination.

72. Defendant is an employer within the meaning of the ADA.

73. Plaintiff has been subjected to discriminatory and retaliatory treatment based upon her disability, her perceived or regarded disability, and/or request for an accommodation, by Defendant, its employees and agents to the point where her status as an employee has been detrimentally affected and she was terminated by Defendant.

74. Plaintiff is entitled to exemplary, compensatory and punitive damages pursuant to the ADA as a result of each and every violation of the act, including costs and reasonable attorney's fees.

75. Defendant and its agents, employees and representatives, breached and violated their duty to Plaintiff by reason of the following acts and/or omissions:

    a. Violating the laws against discrimination by failing to provide Plaintiff with a reasonable accommodation for her disability;

    b. Violating the laws against discrimination by creating a hostile work environment which substantially interfered with her ability to do her job based on her disability; and

    c. Violating the laws against discrimination by terminating Plaintiff based exclusively upon her disability.

76. Defendant breached and violated its duties owed to Plaintiff, by reason of the following acts and/or omissions:

   a. Failing to screen and place in supervisory positions, persons who would be capable of being competent and law-abiding supervisors, and with particular reference to enforcing laws against discrimination in the workplace;

   b. Giving supervisory authority to persons who were known to have propensities as would make them unfit to serve in the capacity of supervisor over disabled employees;

   c. Failing to properly educate and train its employees and supervisors, particularly with reference to the unlawfulness of discrimination in the workplace;

   d. Failing to properly warn or advise its employees and supervising personnel to refrain from discriminating against employees;

   e. Failing to provide reasonable accommodations; and

   f. Suspending and terminating Plaintiff based upon her disability.

77. As a direct and proximate result of the actions of Defendant, Plaintiff was the subject of discriminatory conduct on the part of Defendant, and its agents and employees.

78. Because of the unlawful conduct of Defendant, and its agents and employees, and as a direct and proximate cause of such conduct, Plaintiff has suffered damages including economic damages, wage loss, embarrassment, outrage, mental anguish and anxiety, emotional distress, loss of self-esteem, loss of

earnings and other employment benefits, and a loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendant in an amount in excess of $75,000.00, plus punitive/exemplary damages, together with costs, interest, attorney fees and any other relief this Honorable Court deems appropriate.

## COUNT II
## VIOLATION OF THE MICHIGAN PERSONS
## WITH DISABILITIES CIVIL RIGHTS ACT, MCLA §37.1101, *ET SEQ.*

79. Plaintiff incorporates by reference Paragraphs 1 through 78 above as though more fully set forth herein.

80. Plaintiff suffers from major depressive disorder, which is a disability under the Michigan Persons with Disabilities Civil Rights Act MCLA §37.1101, *et seq.* (PWDCRA).

81. Pursuant to the Michigan Persons with Disabilities Civil Rights Act MCLA §37.1101, *et seq.*, Plaintiff is guaranteed the right to be free from discriminatory treatment and/or discharge from his employment by her employer and/or supervisors based upon her disability.

82. Plaintiff's disability was a factor in Defendants employment decisions, including, but not limited to refusing to accommodate her and terminating her.

83. Defendant is an employer within the meaning of the PWDCRA.

84. Plaintiff has been subjected to repeated and continuous discriminatory treatment based upon her disability by Defendant, its employees and agents to the point where her status as an employee has been detrimentally affected and she was refused to be reasonably accommodated by Defendant and was terminated by Defendant.

85. Plaintiff is entitled to exemplary, compensatory and punitive damages pursuant to the PWDCRA as a result of each and every violation of the act, including costs and reasonable attorney's fees.

86. Defendant and its agents, employees and representatives violated the PWDCRA by reason of the following acts and/or omissions:

   a. Violating the laws against discrimination by refusing to accommodate Plaintiff;

   b. Failing to refrain from creating a hostile work environment based on Plaintiff's disability;

   c. Failing to take serious and corrective action when informed by Plaintiff that the conduct towards her was unlawful; and

   d. Preventing Plaintiff from having full and fair opportunities to her employment based upon her disability.

87. Defendant owed Plaintiff as a disabled employee, a duty to adequately advise their employees to refrain from discriminating against employees.

88. As a direct and proximate result of Defendants harassment and discrimination of Plaintiff solely on the basis that she had a disability or was perceived by Defendant to be a person with a disability Plaintiff has sustained injuries including, but not limited to:

   a. Economic damages;

   b. Mental anguish;

   c. Fright;

   d. Shock;

   e. Embarrassment;

   f. Outrage;

   g. Anxiety;

   h. Emotional distress;

   i. Loss of self-esteem; and

   j. Loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendant in an amount in excess of $75,000.00, plus exemplary damages, together with costs, interest and attorney fees and any other relief this Honorable Court deems appropriate.

## COUNT III
## RETALIATION

89. Plaintiff incorporates by reference paragraphs 1 through 88 of the Complaint as though fully set forth herein.

90. Defendant is Plaintiff's employer under state and federal law.

91. Plaintiff engaged in protected activities by filing a Complaint against Defendant as she was seeking to enforce her rights to be free from harassment, discrimination and retaliation in the workplace under the ADA and PWDCRA.

92. Defendant knew that Plaintiff was engaging in protected activities.

93. As a direct result of Plaintiff engaging in the above-referenced protected activities Defendant has retaliated against Plaintiff.

94. On or about December 12, 2018 Plaintiff was terminated from her employment with Defendants in retaliation for her complaints of discrimination and hostile work environment.

95. The filing of Plaintiff Complaint against Defendant was a significant factor in Defendants' adverse employment action taken against Plaintiff.

96. Because of the unlawful conduct of Defendant, and as a proximate result of such conduct, Plaintiff suffered damages, including economic damages, lost wages, humiliation, embarrassment, outrage, mental anguish and anxiety, emotional distress, loss of self-esteem, loss of earnings and other employment benefits, and a loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff respectfully request judgment in her favor and against Defendant in an amount in excess of $75,000.00, plus punitive/exemplary damages, together with costs, interest, attorney fees and punitive damages as allowed by statute and any other relief this Honorable Court deems appropriate.

                    Respectfully submitted,

                    **BATEY LAW FIRM, PLLC**

          By: /s/Scott P. Batey
              SCOTT P. BATEY (P54711)
              Attorney for Plaintiff
              30200 Telegraph Road, Suite 400
              Bingham Farms, Michigan 48025
              (248) 540-6800-telephone
              (248) 540-6814-fax
              sbatey@bateylaw.com

Dated: December 10, 2019

## **DEMAND FOR JURY TRIAL**

NOW COMES, Plaintiff, Deborah Nicke, by and through her attorneys, Scott P. Batey and the Batey Law Firm, PLLC, and hereby demands a trial by jury on all issues allowed by law.

Respectfully submitted,

**BATEY LAW FIRM, PLLC**

By: /s/Scott P. Batey
    SCOTT P. BATEY (P54711)
    Attorney for Plaintiff
    30200 Telegraph Road, Suite 400
    Bingham Farms, Michigan 48025
    (248) 540-6800-telephone
    (248) 540-6814-fax
    sbatey@bateylaw.com

Dated:  December 10, 2019